FRANK R. BUSEN v. CHEVROLET MOTOR COMPANY OF ST. LOUIS, Appellant.—100 S. W. (2d) 277.

Division One, December 14, 1936.

*McCarthy, Morris & Zachritz* for appellant; *Warren E. Talcott* of counsel.

*S. F. Pinter* and *Mason & Flynn* for respondent.

1100

COLLET, J.—This is an action brought to recover damages on account of personal injuries alleged to have been caused by the failure of the Chevrolet Motor Company of St. Louis and Oscar Mitchell, its

foreman, to equip grinding and buffing machines with sufficient hoods and blowers to adequately carry away dust created by these machines. Plaintiff was an employee of that company and operated the machines. His injury consisted of disease and impairment of his eyes, diseased sinus and lungs. A number of assignments of negligence were made in the petition, but only one was submitted to the jury. The assignment submitted was stated in the petition as follows:

". . . defendants . . . operated . . . buffing, grinding and polishing machines . . . where plaintiff was at work, . . . and negligently failed to provide each and every one of said machines with a hood, blower or suction fan of sufficient power to carry off said dust and to prevent its inhalation by plaintiff and its other employees there at work, in violation of a duly enacted Statute of Missouri, . . . Section 13234, R. S. Mo. 1929 . . ."

The separate answers were general denials. At the conclusion of plaintiff's evidence, instructions in the nature of demurrers were offered by both defendants. The court gave the instruction offered by defendant Mitchell and plaintiff took an involuntary nonsuit with leave as to him. The demurrers offered by the Chevrolet Company at the close of plaintiff's case and again at the conclusion of all the evidence were overruled. The jury awarded plaintiff damages in the sum of $15,000. Judgment was entered accordingly. From that judgment defendant appeals.

Summarized, and combining kindred assignments, appellant's grounds for reversal may be stated as follows:

(1) Respondent's evidence failed to bring the case within the occupational disease statutes, because there was no testimony showing that his disease was incidental or peculiar to the work at which he was employed.

(2) There was no proof that appellant either knew or ought to have known that any work or process at its plant might cause industrial disease. Appellant was therefore under no obligation to provide the safety devices described in Section 13234, Revised Statutes 1929.

(3) There was no proof that respondent's disease was caused by the conditions existing at appellant's plant.

(4) Respondent's instructions were erroneous, and appellant's refused instructions correct.

(5) That the trial court permitted respondent to testify that an insurance company paid respondent for total disability.

(6) That the verdict was excessive.

Respondent's evidence tended to establish the following facts: Respondent was thirty-seven years old at the time of the trial of the case on October 3, 1933. He received an injury to his right eye during childhood, as a result of being struck by a stone. In 1920 he had

an inflammation of the left eye, which he had treated for approximately two months. The inflammation disappeared with no apparent bad effects. Prior to his employment by the Chevrolet Company in 1922, he was in good physical condition. In that year he secured employment in the body department of that company's plant in St. Louis. He worked there until in 1924 when he quit to take employment with the United Drug Company. In 1925 he returned to the employment of the Chevrolet Company and again was in the body department. He worked in that department only two weeks when he was transferred to what was known as the repair department, where he remained four years. In the latter department respondent's work consisted in grinding, buffing and polishing radiator shells for use on automobiles manufactured by appellant. These shells came to that department in a somewhat rough condition and were frequently discolored in appearance. The rough surface was ground off by means of a grinding wheel made of emory. The scratches left from this grinding process were eliminated by means of a buffer which consisted of a wheel made or covered with cloth, and a rack for holding the radiator shells in place. A composition somewhat similar to soap or tallow was placed on the radiator shell which was then brought in contact with the cloth covered wheel revolving at a high rate of speed resulting in the polishing or "buffing" process. This type of work required good eyesight. Respondent discharged the work in a very satisfactory manner, on some occasions being asked by the inspector to refinish work improperly done by some of his co-workers. These machines created a great deal of emory and metal dust resulting from the grinding operations. Some lint and wool from the buffers also seems to have resulted in the operation of that machine. The machines stood in a long row approximately in the center of a very large building occupied by appellant's plant. The building is described as being 800 feet long and 80 feet wide. A large pipe was erected immediately back of the machines extending the entire length of the row with small pipes leading from the larger pipe to each of the machines. These pipes were connected with a blower which created a suction for the purpose of drawing off the dust created by the machines. The outlet of the large pipe was in a box on the outside of the building. The system of pipes carried away only about one-third of the dust with the result that when the machines were in operation the dust was very heavy in front and around them. Respondent, and other employees who operated the machines, were furnished with goggles but the men seldom used them because dust and steam quickly collected on the glasses, making it impossible to see well enough to do the work properly and also making it dangerous because their vision was impaired to such an extent that there was danger of "missing a lick" on the grinding wheel and getting caught

in the wheel. Respondent tried to wear the goggles but soon gave it up. None of the other employees wore them. The constant exposure to the dust around these machines caused respondent's eyes and nose to become inflamed, resulting in sneezing, headaches, loss of appetite, loss of sleep and loss of thirty pounds in weight. The headaches and sneezing began in 1927. Respondent complained to his foreman, Mitchell, and requested that larger blowers be obtained to adequately carry away the dust. He states that the foreman advised him to go to the company doctor about his trouble, which he did. The doctor treated his nose and advised him to use a nose spray. He followed this advice, but the sinus condition gradually got worse. In 1929 he was transferred to work on another floor. This work consisted of assembling tail lights and tire carriers. At the time he was transferred his eyes were inflamed and sore, but he could see very well. In this latter work he was stationed about eight feet from a conveyor which brought small parts from an oven where they had been baked, a process used in painting. These small parts were stacked near respondent's machine. Because they were heated and had recently been painted they gave off fumes and smoke, which kept respondent's eyes inflamed and his nose irritated. He worked there until March 14, 1930. About two months before that time his left eye became inflamed, gave him considerable pain and his vision became "foggy." A few days prior to March 14, his left eye began to swell. On March 14 he quit his work as a result of the condition of his eyes. He immediately went to see a doctor who treated the left eye and advised him to have his sinus and teeth examined and his blood tested. Soon thereafter, he consulted a second physician who did not treat the eyes but advised that an examination be made of his nose, throat, lungs and teeth. He had these examinations made, several of them, at the Washington University Clinic in St. Louis. Upon the advice of his physician a tonsil operation was performed in May, 1930, but this did not result in any benefit and the eye continued to get worse. About the first of July, 1930, on the advice of a physician he had a sinus operation. Since that time his eyes continued in substantially the same condition, but the operation improved the sinus trouble somewhat.

Walter Vasier, who was employed on the grinding and buffing machines with respondent, testified that the dust caused a burning of the eyes and soreness in the nose.

Benjamin R. Wilson, also testifying in plaintiff's behalf, stated that he worked on these same machines with respondent and was what was known as a gang leader. He says that the dust stopped up the nose on one occasion so much of it got in his eyes that he was laid up for two weeks.

Gideon Murphy, another gang foreman in that department, testified

that the blowers were not sufficiently strong to eliminate the dust and that only about one-third of it was taken away. He says that he talked to Mitchell, the foreman, about this condition many times. Murphy also had trouble with his head and lungs while working there.

Louis Bergdorf was the inspector of the work done in that department while respondent was there. He testified that a great deal of dust was in the air around the machines. He illustrated the extent of this condition by stating that in the evening, after going to and from the machines continually during the day, he would be black with dust. Bergdorf says that he knew respondent's eyesight was good while he was working on these machines because frequently he, Bergdorf, would take work improperly done by other employees to respondent to be finished; that this finishing work required good eyesight and respondent did his work very well.

Dr. Briggs, an X-ray specialist, made an X-ray examination of respondent's chest on June 7, 1933. He found calcified nodes in the hilar region on both sides and some fibrosis in both lungs. He stated this condition could have been caused by the conditions under which respondent worked in the grinding and buffing department.

Dr. Charles Rosen, lung specialist, examined respondent September 20, 1933, and from that examination and an examination of the X-ray taken by Dr. Briggs, stated his conclusion to be in accord with the conclusion reached by Dr. Briggs both as to respondent's condition and as to the cause of the trouble with the exception that Dr. Rosen's personal examination disclosed feeble breath sounds throughout the entire chest, front and back, which was not made apparent by the X-ray.

Dr. C. E. Eimer, an ear, nose and throat surgeon, examined respondent during the week preceding the trial of the cause, and stated, without objection, that in his opinion respondent's sinus trouble was caused by the condition under which respondent worked while in appellant's employ.

Dr. Charles W. Tooker, an eye specialist, examined respondent in June and September, 1933. He stated that the retained central acuity of respondent's left eye was six per cent and that the right eye was practically blind. He said that in his opinion the condition of the left eye was caused by the disease of the nasal sinus and that respondent's condition was susceptible to only a possible slight improvement.

Much testimony was offered by appellant contradictory to the facts above related. That testimony need not be set out here.

█ In the assertion of its first and second grounds for reversal appellant misconceives the theory of respondent's case. Respondent predicates liability upon the violation of Section 13234, Revised Statutes 1929, which is as follows:

"Every person, firm or corporation using any polishing wheel or machine of any character which generates dust, smoke or poisonous gases in its operation, shall provide each and every such wheel or machine with a hood, which shall be connected with a blower or suction fan of sufficient power to carry off said dust, smoke and gases and prevent its inhalation by those employed about said wheel or machine; and any violation of this section is hereby declared to be a misdemeanor, and a person, firm or corporation so violating this section shall, upon conviction, be punished by a fine of not less than one hundred dollars nor more than five hundred dollars for each and every offense. It shall be the duty of the commissioner of labor and industrial inspection and his assistants and deputies to see that this section is enforced and to prosecute any violations thereof."

Failure to comply with that statute is negligence *per se*. [Dodd v. Independence Stove & Furnace Co., 330 Mo. 662, 51 S. W. (2d) 114, l. c. 118; Lore v. American Mfg. Co., 160 Mo. 608, l. c. 622, 61 S. W. 678; Boll v. Condie-Bray Glass & Paint Co., 321 Mo. 92, 11 S. W. (2d) 48, l. c. 54.] In referring to a statute having a similar purpose (Sec. 13238, R. S. 1929) this court said:

"However, was it necessary to prove a specific act of negligence as the cause of the falling of the scaffold? Where the statute imposes a duty to provide safety appliances of any kind for protection of persons from injury, the failure of the duty imposed is negligence *per se*. [Stafford v. Adams, 113 Mo. App. l. c. 721.]" [Prapuolenis v. Const. Co., 279 Mo. 358, l. c. 366, 213 S. W. 792.]

The testimony outlined above is ample to sustain the finding that the statute was not complied with. It was also sufficient to sustain the conclusion that the failure to remove the metallic dust and the long continued breathing of it by respondent caused his injuries. In view of the evidence it was not necessary for the jury to base an inference on an inference, as appellant charges.

Appellant contends that respondent's instructions 1 and 3 are erroneous in that they authorize a finding of negligence if any dust at all escaped into the atmosphere about the machines. Instruction 1 told the jury that appellant was negligent if it failed to provide the grinding and buffing machines "with a blower or suction fan of sufficient power to carry off the dust created by the operation of the machines and that, as a result thereof, *large quantities of dust* . . . permeated the atmosphere. . . ." (Italics ours.) Respondent's Instruction 3 was as follows:

"The court instructs you that by reason of a duly enacted statute of the State of Missouri an express duty is laid upon every person, firm or corporation using any polishing wheel or machine of any kind or character which generates dust in its operation to provide each and every such wheel or machine with a hood which shall be connected

with a blower or suction fan of sufficient power to carry off said dust, and prevent its inhalation by those employed about said wheel or machine.

"The court further instructs you that, if you believe and find from the evidence that the plaintiff was employed by the defendant at such a wheel or machine which generated dust in the course of its operation, and that said wheel or machine was not provided with and did not have attached to its hood a blower or suction fan of sufficient power to carry off the dust created by the operation of the machine, then the defendant was guilty of negligence, and if you find and believe from the evidence that plaintiff suffered illness or disease as described in the evidence as a direct result of said negligence, then your verdict should be for the plaintiff."

Appellant's Instruction 5 told the jury in effect that if the machines were standard devices in general use, equipped with a blower, exhaust, flue, and a fan and that in furnishing that equipment appellant exercised ordinary care to furnish respondent safe appliances wherewith to work, respondent was not entitled to recover. The instructions read together are not susceptible to the construction appellant gives them. Hence respondent's instructions are not open to criticism on this ground.

■ It is further argued that there was no evidence to support respondent's Instruction 2. That part of the instruction which furnishes the basis for this objection is as follows:

"Yet if you further find and believe from the evidence that he had recovered from the trouble with his left eye so that he had normal vision in said eye."

Respondent's testimony on this point was as follows:

"Q. By the way, did you have any difficulty with your left eye at any time before you entered the employ of the Chevrolet Motor Company? A. Yes, sir.

"Q. And when was that? A. That was in about 1920.

"Q. What was the nature of the difficulty you had at that time? A. It just got a little reddish like.

"Q. Your left eye? A. Yes, sir.

"Q. Did you see someone in regard to it? A. Yes, sir.

"Q. Who did you see? A. Doctor Haas.

"Q. And what did you do, or he do for you? A. He treated my eye.

"Q. And what was the result of his treatment? A. It cleared it up.

"Q. How long would it take? A. Well, it was a few months—couple of months; probably three months.

"Q. And thereafter did you have any—experience any more difficulty? A. No, sir.

"Q. Was your vision impaired during the time that you went

there in 1920? Was your eyesight bad at that time, or not? A. In 1920?

"Q. Yes. A. No, sir."

The record does not support appellant's charge.

 Appellant asserts in its points and authorities that respondent's instructions 1, 2, 3 and 4 "assumed unproved facts; assumed certain facts to constitute negligence without requiring a finding that such facts did constitute negligence," and that its refused instructions J, K, L, M, N, O, P, Q and R contained correct statements of law and should have been given. Neither in the points and authorities nor elsewhere is our attention directed to any specific grounds for these charges. Our examination of the instructions discloses none.

 It is argued that the verdict is excessive. Appellant does not discuss the subject in its brief. We have re-examined the record with this assignment in mind and, after considering the authorities cited, conclude that the verdict is not excessive.

Other assignments of error are made but have not been briefed and hence will not be considered. The judgment should be affirmed. It is so ordered. All concur.